1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DOUGLAS FERRIE, an individual,

                    Plaintiff,

        v.

WOODFORD RESEARCH, LLC, a
Kentucky limited liability company;
HUBERT SENTERS, an individual;
KAREN ARVIN, an individual; ROSS
GIVENS, an individual; and JARED
CARTER, an individual; et al.

                    Defendant.

CASE NO. 3:19-cv-05798-RBL

ORDER ON WOODFORD
DEFENDANTS' MOTION TO
DISMISS

## INTRODUCTION

THIS MATTER is before the Court on Defendants Woodford Research, LLC; Hubert

Senters; Karen Arvin; Ross Givens; and Jared Carter's (collectively the "Woodford Defendants")

Motion to Dismiss. Dkt. # 30. Ferrie's lawsuit against the Woodford Defendants is predicated on

their role in promoting a cryptocurrency arbitraging scheme that Ferrie invested a substantial

sum of money in. Although Ferrie claims his investments were subject to undisclosed fees,

including a 95% withdrawal fee.

Ferrie claims the Woodford Defendants are liable for violations of Sections 10 and 12 of the Securities Act, various forms of fraud, and unjust enrichment. The Woodford Defendants argue that Ferrie lacks standing to sue and that the Court lacks personal jurisdiction. They also contend that Ferrie's claims are impermissibly broad and legally insufficient. For the following reasons, the Court GRANTS the Woodford Defendants' Motion in part and DENIES it in part.

**BACKGROUND**

According to the First Amended Complaint, Woodford Research is a Kentucky Limited Liability Company. Ferrie alleges that the four individual Woodford Defendants—Senters, Arvin, Givens, and Carter—"manage and control" the company, with Senters also owning it. FAC, Dkt. # 29, at 3-4. All four individuals are Kentucky residents, while Ferry lives in Washington State.

For several years, Ferrie has followed the "Hubert Senters Daily Video Update," in which Senters "discusses price trends of stocks and commodities to predict future prices." FAC at 5. Ferrie's declaration states that he subscribes to an email list associated with these videos and received an email in November 2018 from Senters notifying him of a Webinar presentation about the "1% Club." Ferrie Dec., Dkt. # 33, at 2. Ferrie watched the Webinar on November 30, 2018. He alleges that Senters, Arvin, and Woodford Research published the Webinar, which "described a new investment opportunity involving arbitraging cryptocurrencies." FAC at 5. According to Ferrie, Senters, Arvin, and Woodford Research made the following representations (among others) during the Webinar:

- There are approximately 200 exchanges and over 2,000 cryptocurrencies. Defendant ARBITRAGING developed a "highly advanced arbitrage bot" that tracked all of the exchanges and searched for the largest price differentials in each cryptocurrency. Upon finding sufficient price differentials, ARBITRAGING executed trades to exploit those differentials. On a daily basis, Defendant ARBITRAGING totaled the profits and distributed those earnings to investors

based upon a pro rata share of their investment.

- Defendant ARBITRAGING consistently received an average rate of return of 0.73 percent within the seven-month period preceding December 2018. In other words, an investor's money doubled every three months.

- This opportunity only arises once in a generation.

- Projected returns of 0.73 percent per day will likely remain available for another 18 to 24 months.

- Defendant ARBITRAGING had been thoroughly scrutinized by both Defendant SENTERS' own WOODFORD RESEARCH team as well as by members of the Masterminds Association, where he is also a member. Considerable due diligence was undertaken to ensure that both Defendant ARBITRAGING and Defendant PETERSON were legitimate and trustworthy.

- The only risk is the setup procedure; if it is followed cautiously and precisely according to the procedure he provides, then risk is eliminated.

- There is an early withdrawal penalty if funds are withdrawn within the first three weeks of opening an account. After three weeks, there would be no withdrawal penalty.

- No other fees or assessments.

- Enter an affiliate code on Defendant ARBITRAGING's website during the registration process to obtain additional perks, such as an invitation to the 1% Club Telegram group chat.

FAC at 6-7.[1] Ferrie further alleges that Senters made the following statements during the

Webinar:

- "I recommend [that an investor] put whatever risk amount of money you're going to start with, whether its $250 or if it's a million dollars. * * * Whatever your risk profile is, I would initially go ahead and put it in Coinbase, buy your ETH and then just start moving it over in small increments, and then once you're cool with it go: 'Okay, I know what I'm doing.'"

---

[1] The Court notes that these representations, unlike those attributed to Senters alone, are not in quotations marks in the FAC.

- "Let's just get the money in here and get you making some money. Who cares if it's going to cost you $0.02 or $20.00, you need to get it working for you."

- "Right now, I'm making $600, $700 a day, so I'm under that $1,000 limit; so I just take it out like clockwork: $600, $700 a day. Ding, ding! It takes five minutes."

- "I'm being completely transparent."

- . . . this is sketchy too, so I have a limited amount of funds that I want to put in this in case this is too good to be true and it just stops working and dude runs off with all of our money and goes to Belize with his secretary. I'm going to protect myself at all times. The same thing I'm telling you guys."

- "There must be an acid test for Ponzi schemes spilling. [I]t smells just like one, right? You're like: 'This smells and tastes fishy as hell.' I can just tell you it's working."

- "I've got $100,000 working in this robot."

- "Who are the guys that control this, and where are they located? Guy's name is David [Peterson], and he lives in Texas. They have won a couple of cryptocurrency awards at conferences. If it is a Ponzi scheme, it is one of the most well pulled off ones I've ever seen. * * * I know a lot of other guys in the Mastermind that know him personally."

- "Folks, this is real. Let someone -- and A-Bot -- do it for you."

FAC at 7-8.

Based on these representations, Ferrie purchased a "1% Club" subscription on December 1, 2018, for which he paid $997.00 to Woodford Research, Senters, and Arvin. The subscription included a promise from Senters, Arvin, and Woodford Research to assist Ferrie with setting up and working his Arbitraging account.

Senters then put Ferrie in contact with Defendants Infogenesis Consulting Group, LLC and Kurt F. Weinrich Sr., who gave Ferrie advice on how to withdraw money from his retirement accounts to invest with. They also helped him set up his own company: DCAE Ltd., LLC. Under this name, Ferrie opened a bank account and cryptocurrency account at the Gemini

exchange. Ferrie then "proceeded to withdraw his retirement funds from his investment accounts, transfer those funds to the Plaintiff-DCAE Gemini cryptocurrency account, convert those U.S. Dollar funds into Ether (ETH), and then deposit those ETH into Plaintiff's new account at Defendant ARBITRAGING." FAC at 9-10.

Ferrie made his first investment of $12,000 in his Arbitraging.co account on December 31, 2018. He observed that the daily returns "ranged from 0.57 to 1.01 percent" with an average of .644 percent. *Id*. at 10. Ferrie admits this was "relatively close" to the rate described in the Webinar.

On January 1, 2019, Arbitraging's website shut down. Ferrie emailed Woodford Research's support address and was reassured that this was not abnormal and trading would continue. The site went back online a few days later but announced an audit to address problems with high volume trading. The announcement mentioned additional fees related to the audit, but Ferrie was able to avoid these fees.

On January 13, 2019, Ferrie alleges that he emailed Arvin to request discontinuance of a "2-percent referral commission" being deducted from his account. *Id*. at 12. The FAC is unclear about when or how Ferrie discovered this fee. Arvin responded the next day and informed Ferrie that "[the 2 percent referral fee] was addressed by [Defendant] Hubert [Senters] in the live member webinar on 1/3/19." *Id*. Arvin also informed Ferrie that the only way to end the "affiliate relation" was to close his current Arbitraging account and open a new one. *Id*. at 12-13. Ferrie alleges that this fee was never disclosed.

On January 17 and 18, 2019, Ferrie invested an additional $140,000 into his Arbitraging account. His investment continued to accrue earnings in excess of 0.5%. On February 25, he

added another $25,179, this time from his health savings account. This brought his balance up to

$184,045.59.

On March 23, 2019, Arbitraging announced the following additional fees on daily

earnings:

- Requiring daily earnings to be limited to 500 ARBs (approximately $400.00) unless the account holder has at least 50,000 ARBs invested in Defendant Arbitraging's Vault.

- 5 percent daily earning fee on accounts with an Active aBot value of between $25,000.00 and $99,999.00;

- 7 percent daily earning fee on accounts with an Active aBot value of $100,000.00 or greater; and

- Withdrawal fees and extremely unfavorable and arbitrary exchange rate formulations that would translate into losing approximately 95 percent of all funds invested.

FAC at 14. Ferrie alleges that these fees applied to gross profits, rather than net profits, resulting

in "a net negative return for accounts with an active aBot value of $100,000.00 or more." *Id*.

Woodford Research, Senters, and Arvin denied knowledge of these fees but also stated

that they did not care about them because they were still making money. However, Senters also

"confessed to being one of the high volume account holders that made a majority of profits by

trading on Defendant ARBITRAGING's internal exchange." *Id*. at 15. When Ferrie requested

Peterson's email address, Arvin responded that the Woodford Defendants were simply customers

of Arbitraging and did not have Peterson's contact information.

Ferrie alleges that his account would be valued at $441,307.20 if not for various

undisclosed fees and penalties. He sued on August 28, 2019 to recover his investment of

$177,179.00, plus lost profits, interest, and attorneys' fees. *Id*. at 3.

**DISCUSSION**

**1.    Standing**

"A complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if the action . . . is not a case or controversy within the meaning of the Constitution"—i.e., if the plaintiff lacks standing to assert a claim. *United Transp. Union v. Burlington N. Santa Fe R. Co.*, No. C06-5441 RBL, 2007 WL 26761, at *2 (W.D. Wash. Jan. 2, 2007), *aff'd*, 528 F.3d 674 (9th Cir. 2008). As with other motions based on subject matter jurisdiction, the plaintiff has the burden of demonstrating that standing exists. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Defendants assert a "facial attack" against standing, which is limited to the complaint's allegations. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

The Woodford Defendants argue that Ferrie lacks standing because all his investments were made via DCAE Ltd., LLC, meaning Ferrie himself was not injured. "Generally, a shareholder does not have standing to redress an injury to the corporation in which it holds stock." *EMI Ltd. v. Bennett*, 738 F.2d 994, 997 (9th Cir. 1984) The same holds true for members of an LLC. *Finley v. Takisaki*, No. C05-1118JLR, 2006 WL 1169794, at *3 (W.D. Wash. Apr. 28, 2006) (citing *In re Real Marketing Servs., LLC*, 309 B.R. 783, 788 (S.D.Cal.2004)). "There are two major, often overlapping, exceptions to the general rule: (1) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders, and (2) where there is a special duty, such as a contractual duty, between the alleged wrongdoer and the shareholder." *Hikita v. Nichiro Gyogyo Kaisha, Ltd.*, 713 P.2d 1197, 1199 (Alaska 1986); *see also Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 640 (9th Cir. 1988). Injury to a shareholder is distinct from the corporation when, for example, "the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly." *Von*

1  *Brimer v. Whirlpool Corp.*, 536 F.3d 838 (9th Cir. 1976) (quoting *Erlich v. Glasner*, 418 F.2d

2  226, 228 (9th Cir. 1969)).

3        Here, Ferrie alleges a fraud affecting him personally. When the Woodford Defendants

4  published their Webinar and accepted Ferrie's subscription to the 1% Club, DAE did not exist.

5  Indeed, it was through the Woodford Defendants' contact that Ferrie was advised to create DAE,

6  which acted solely as a vehicle for moving Ferrie's personal funds into his Arbitraging account

7  and, allegedly, into the Woodford Defendants' pockets. Because Ferrie's lawsuit focuses on

8  losses from a fraud against him, his injury is separate from DAE's and he has standing to sue

9  individually.

10  **2.**    **Personal Jurisdiction**

11        "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the

12  plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Mavrix Photo, Inc. v.*

13  *Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011). If the plaintiff succeeds, the burden

14  shifts to the defendant to show jurisdiction is unreasonable. *Id.* "For purposes of plaintiff's prima

15  facie jurisdictional showing, 'uncontroverted allegations in . . . [plaintiff's] complaint must be

16  taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved

17  in . . . [plaintiff's] favor." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129

18  (9th Cir. 2010) (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir.

19  2002)); *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

20        A court's personal jurisdiction analysis begins with the "long-arm" statute of the state in

21  which the court sits. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d

22  1114, 1123 (9th Cir. 2002). Washington's long-arm statute extends the court's personal

23  jurisdiction to the broadest reach that the United States Constitution permits, so the jurisdictional

24

1  analysis under state law and federal due process are the same. *Byron Nelson Co. v. Orchard*

2  *Management Corp.*, 95 Wn.App. 462, 465 (1999); *Schwarzenegger*, 374 F.3d at 800–01.

3        Personal jurisdiction exists in two forms: general and specific. *Dole Food Co. v. Watts*,

4  303 F.3d 1104, 1111 (9th Cir. 2002). For specific jurisdiction, which is at issue here, the Ninth

5  Circuit applies a three-prong test. *Schwarzenegger*, 374 F.3d at 802. First, "[t]he non-resident

6  defendant must purposefully direct his activities or consummate some transaction with the forum

7  or resident thereof; or perform some act by which he purposefully avails himself of the privilege

8  of conducting activities in the forum, thereby invoking the benefits and protections of its laws."

9  *Id*. (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.1987)). Second, "the claim must be one

10  which arises out of or relates to the defendant's forum-related activities." *Id*. Finally, "the

11  exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be

12  reasonable." *Id*.

13        For the first prong, the "purposeful direction" analysis typically applies in tort cases[2] and

14  "usually consists of evidence of the defendant's actions outside the forum state that are directed

15  at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id*. at

16  803. To determine if the defendant purposefully directed activities at the forum, the Ninth Circuit

17  applies the "effects test" from *Calder v. Jones*, 465 U.S. 783 (1984). Under this test, "the

18  defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum

19  state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."

20  *Mavrix Photo*, 647 F.3d at 1228 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606

21  F.3d 1124, 1128 (9th Cir. 2010)).

22

23  [2] The Woodford Defendants argue that the purposeful direction analysis is appropriate because
    Ferrie's claims against them are not based in contract. Ferrie does not dispute this. The Court

24  agrees that purposeful direction applies.

The parties mainly dispute whether the Woodford Defendants "expressly aimed" at the forum. In cases involving online commerce, the Ninth Circuit has held that simply maintaining a passive website is not enough to satisfy the express aiming prong. *Id*. at 1229. But "a passive website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient." *Id*. (quoting *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002)).

A defendant therefore has likely targeted the forum when it has actual or constructive knowledge of its consumer base there. *Id*. at 1230. For example, in *Mavrix Photo*, the court concluded that the defendant had such knowledge because its third-party advertisers expressly targeted forum state residents. *Id*. at 1230; *see also Wilson v. PTT, LLC*, 351 F. Supp. 3d 1325, 1335 (W.D. Wash. 2018) (express aiming where defendant carried out numerous transactions with forum state residents and could determine their IP addresses). The court concluded that when "a website with national viewership and scope appeals to, and profits from, an audience in a particular state the site's operators can be said to have 'expressly aimed' at that state." *Mavrix Photo*, 647 F.3d at 1231.

However, the Supreme Court has made clear that the specific jurisdiction analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id*. at 286. But, in the context of intentional torts, it is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff." *Id*. at 286 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

1    Here, Ferrie argues the Woodford Defendants "expressly aimed" at the forum because he

2    "believe[s] [he is] just one of many Washington residents who subscribed to the Woodford

3    Defendants' 'One Percent Club.'" Opposition at 10. Ferrie further asserts that the Woodford

4    Defendants "can be charged with actual or constructive knowledge of the user base . . . because

5    they were aware that individuals with Washington IP addresses viewed the webinar and

6    subsequently subscribed to the 'One Percent Club.'" *Id*. at 10-11. In addition, Ferrie points out

7    that the Woodford Defendants communicated with him directly after he joined the 1% Club. *Id*.

8    at 10.

9        The Woodford Defendants argue that Ferrie has only shown that *he* targeted *them* by

10   watching the Webinar and subscribing to the 1% Club, not the other way around. Motion at 7.

11   Even if Ferrie was targeted, his allegations and declaration only establish a link to him

12   personally, not the forum. *Id*. The Woodford Defendants further argue that their communications

13   with Ferrie occurred after the harm-causing events, which were the Webinar and 1% Club

14   subscription, and therefore cannot support jurisdiction. *Id*. Finally, the Woodford Defendants

15   argue that Ferrie's alleged harm was not predictable because it was Arbitraging that suddenly

16   imposed fees months after Ferrie viewed the Webinar. *Id.*

17       The Court agrees with the Woodford Defendants that there is insufficient information to

18   establish whether Woodford Research and its related individuals expressly aimed at the forum.

19   Ferrie's arguments merely assume that the Woodford Defendants have a substantial base of

20   subscribers, viewers, and customers in Washington and that they can identify the location of

21   these individuals. Yet there are no allegations or evidence supporting these theories. Ferrie's

22   FAC and declaration only describe the Woodford Defendants' engagement with him alone. This

23   might be enough for jurisdiction if that engagement was "intertwined" with the forum, but Ferrie

24

1  does not describe what forum-related information he provided that would have apprised

2  Woodford Defendants of his location.[3] Absent more information about the Woodford

3  Defendants' contact with Washington, the Court cannot determine if jurisdiction exists.[4]

4        Limited discovery regarding jurisdiction is the most efficient way of resolving this issue.

5  A district court may order discovery where "pertinent facts bearing on the question of

6  jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."

7  *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quoting *Butcher's Union*

8  *Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir.1986)); *see also Blair v. CBE Grp.*

9  *Inc.*, No. 13-CV-134-MMA WVG, 2013 WL 2029155, at *3 (S.D. Cal. May 13, 2013) (granting

10  "limited jurisdictional discovery because at least some evidence exists that [the defendant]

11  directed its activities to residents of this District."). Ferrie's allegations suggest that the

12  Woodford Defendants may have sufficient contacts with the forum to support jurisdiction. This

13  justifies limited discovery into the Woodford Defendants' viewer and customer base in

14  Washington, as well as their knowledge of Ferrie's location.

---

[3] The Court notes that there is ambiguity, and potentially a dispute of fact, regarding whether Senters himself emailed Ferrie to advertise the Webinar or whether that email was sent by Woodford Research. *Compare* Senters Dec., Dkt. # 31, at 2-3 (stating that Washington residents receive communications from Woodford Research only if they request them by "signing up for Woodford's email distribution list") *with* Ferrie Dec., Dkt. # 33, at 2 (describing subscription to "Hubert Senters Daily Video Update," through which Ferrie received "an e-mail from Mr. Senters soliciting [him] to attend a webinar").

[4] As the Court discusses more later, Ferrie's allegations are currently insufficient to impute Woodford Research's actions to the individual Woodford Defendants. "[T]he veil separating affiliated corporations may . . . be pierced to exercise personal jurisdiction over a foreign defendant in certain limited circumstances." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015). "In order to find an alter ego relationship and pierce the corporate veil, a party must prove "(1) that there is such a unity of interest and ownership that . . . separate personalities no longer exist and (2) that failure to disregard [the separate entities] would result in fraud or injustice." *Langlois v. Deja Vu, Inc.*, 984 F. Supp. 1327, 1336 (W.D. Wash. 1997). Ferrie's allegations supporting his "alter ego" theory are formulaic and conclusory. *See* FAC at 26-28. In particular, the FAC barely mentions Givens and Carter.

### 3.     Failure to State a Claim

Dismissal under Fed. R. Civ. P. 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although the court must accept as true the complaint's well-pled facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper 12(b)(6) motion to dismiss. *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). On a 12(b)(6) motion, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

Fed. R. Civ. P. 9(b) establishes heightened pleading standards for claims "grounded in fraud." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). For such claims, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Vess*, 317 F.3d at 1107.

### a.  Conspiracy, Alter Ego, and Over-Broad Pleading

In addition to attacking Ferrie's claims as insufficient, the Woodford Defendants argue that Ferrie impermissibly lumps all Defendants together when asserting his claims. The Woodford Defendants also contend that Ferrie's allegations of civil conspiracy and alter ego liability are implausible. These issues are related: if Ferrie's allegations of civil conspiracy or alter ego liability are plausible, then Defendants' actions can be attributed to each other and Ferrie's decision to lump them together may be proper, at least in some cases.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F. Supp. 3d 887, 894 (N.D. Cal. 2014). In Washington State, civil conspiracy requires 'that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy.'" *Neravetla v. Virginia Mason Med. Ctr.*, No. C13-1501-JCC, 2014 WL 12787979, at *6 (W.D. Wash. Feb. 18, 2014) (citing *All Star Gas, Inc. of Wash. v. Bechard*, 998 P.2d 367, 372 (Wash. Ct. App. 2000)).

"Mere suspicion or commonality of interest is insufficient to prove a conspiracy." *Schweickert v. Hunts Point Ventures, Inc.*, No. 13-CV-675RSM, 2014 WL 6886630, at *6 (W.D. Wash. Dec. 4, 2014). Instead, a plaintiff must allege facts sufficient for the court to "reasonably infer that [the defendants] entered into an agreement." *Kische USA LLC v. Simsek*, No. C16-0168JLR, 2016 WL 7212534, at *16 (W.D. Wash. Dec. 13, 2016). Further, "Rule 9(b) imposes heightened pleading requirements where 'the object of the conspiracy is fraudulent.'" *Swartz v.*

1   *KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (quoting *Wasco Prods., Inc. v. Southwall Techs.,*

2   *Inc.*, 435 F.3d 989, 991 (9th Cir.)).

3         Like civil conspiracy, "[a] request to pierce the corporate veil is only a means of

4   imposing liability for an underlying cause of action and is not a cause of action in and of itself."

5   *Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir. 1999). The

6   alter ego theory applies when "the corporate entity has been disregarded by the principals

7   themselves so that there is such a unity of ownership and interest that the separateness of the

8   corporation has ceased to exist." *Grayson v. Nordic Const. Co.*, 92 Wash. 2d 548, 553 (1979).

9   Consequently, if an individual principal "so dominates and controls a corporation that such

10  corporation is [their] alter ego, a court is justified in piercing the veil of corporate entity and

11  holding that the corporation and private person are one and the same.'" *Rapid Settlements, Ltd.'s*

12  *Application for Approval of Transfer of Structured Settlement Payment Rights*, 166 Wash. App.

13  683, 692 (2012) (quoting *Standard Fire Ins. Co. v. Blakeslee*, 54 Wash.App. 1, 5 (1989)).

14        Ferrie's allegations of civil conspiracy and alter ego liability do not pass scrutiny. Rather

15  than describe each Defendant's conspiratorial conduct, Ferrie broadly alleges that "Defendants

16  agreed and combined to engage in a civil conspiracy to commit the unlawful acts as described [in

17  the complaint]." FAC at 29. Although Ferrie's allegation that the Woodford Defendants received

18  a 2% fee on his investments suggests a relationship between them and Arbitraging, it does not

19  support an inference that they benefitted from Arbitraging's later, more draconian fees.[5] There is

20  also no plausible allegation showing that the Woodford Defendants conspired amongst

21

22

23  _____
    [5] Ferrie's allegations about the 2% commission fee are also vague and sometimes confusingly overlap with his allegations about another referral fee allegedly paid by Arbitraging to the Woodford Defendants.

24

themselves; indeed, Carter and Givens receive only a passing reference in the FAC. Ferrie's conspiracy allegations are therefore not plausible.

The same applies to his theory of alter ego liability. Again, Ferrie broadly asserts that the individual Defendants "controlled, dominated, and operated" their respective entities, "intermingled their assets," and utilized company funds for individual use. FAC at 28-29. These allegations are conclusory and do not support an alter ego theory at this stage. Conspiracy and alter ego are also not independent causes of action, so Ferrie's claims are dismissed insofar as they assert separate causes of action under these theories.

To survive a Rule 12(b)(6) motion to dismiss, a complaint cannot treat the defendants as an "undifferentiated mass." *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, No. 2:08-MD-1919 MJP, 2009 WL 3246994, at *10 (W.D. Wash. Oct. 5, 2009). "Generally, '[u]ndifferentiated pleading against multiple defendants is improper' because it fails to give each defendant notice of the specific allegations and claims that pertain to it." *Steinley v. Health Net, Inc.*, No. CV 18-5458 PSG (SKX), 2018 WL 6985318, at *5 (C.D. Cal. Dec. 4, 2018) (quoting *Corazon v. Aurora Loan Servs. LLC*, No. 11-542 SC, 2011 WL 1740099, at * 4 (N.D. Cal. May 5, 2011)).

All of Ferrie's claims lump Defendants together in just this manner. This is unacceptable and the FAC must be amended so to fix this problem. Further, the FAC contains no specific allegations about the actions of Givens and Carter. Ferrie must explain how these individuals are subject to liability, improve his allegations of imputed liability, or leave them out of the lawsuit.

b.     *Section 12 of the Securities Act*

Under Section 12(1) of the Securities Act, "[a]ny person who . . . offers or sells" an unregistered security using means of interstate transportation or communication is liable to the

1    purchaser of the security. 15 U.S.C. § 77l(a)(1) (citing § 77e(a)). In *Pinter v. Dahl*, the Supreme

2    Court held that the Act's definition of a "seller" encompasses not only those who transfer title to

3    a security but also those who "solicit securities purchases." 486 U.S. 622, 646 (1988). The Court

4    pointed out that "solicitation is the stage at which an investor is most likely to be injured, that is,

5    by being persuaded to purchase securities without full and fair information." *Id*. at 646-47.

6    Liability under Section 12(a) therefore extends to anyone who "solicits the purchase, motivated

7    at least in part by a desire to serve his own financial interests or those of the securities owner."

8    *Id*. at 647; *see also Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 537 (9th Cir. 1989)

9    (adopting the *Pinter* definition of "seller" for both Section 12(1) and (2) of the Securities Act).

10       However, *Pinter* also notes the Act's "failure to impose express liability for mere

11   participation in unlawful sales transactions" as evidence that "Congress did not intend that the

12   section impose liability on participants' collateral to the offer or sale." *Pinter*, 486 U.S. at 650,

13   651 n.27. Courts have looked to this language when assessing claims brought against a security

14   issuer that utilized an underwriter to transfer title. In such situations, the Third Circuit has held

15   that the "purchaser must demonstrate [the issuer's] direct and active participation in the

16   solicitation of the immediate sale." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir.

17   1996) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989)). And

18   according to the Fifth Circuit, "[t]o count as 'solicitation,' the seller must, at a minimum, directly

19   communicate with the buyer." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003).

20   Merely signing the registration statement for the security is not enough. *Id*.

21       Some courts have applied these principles to dismiss Section 12 claims predicated on

22   promotional statements about an IPO or merger by company officers at "road show"

23   presentations. In *In re Infonet Services Corporation Securities Litigation*, for example, the court

24

1  held that statements at road shows did not make the defendants "sellers" because there was no

2  allegation that they "personally or directly solicited any of the named Plaintiffs." 310 F. Supp. 2d

3  1080, 1102 (C.D. Cal. 2003); *see also Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL

4  5412397, at *7 (W.D. Wash. Dec. 29, 2008) (holding that "[t]he weight of authority indicates

5  that [preparing a prospectus and speaking at road shows] does not constitute active solicitation

6  under *Pinter*."). *Vanguard Specialized Funds v. VEREIT Inc.* reached a similar conclusion when

7  scrutinizing press releases and a conference call describing an upcoming merger as an "epic

8  transaction" that would lead to a "much stronger company." No. CV-15-02157-PHX-ROS, 2016

9  WL 5858735, at *17 (D. Ariz. Oct. 3, 2016). The court drew an analogy with road shows and

10  dismissed the statements as lacking "direct and active participation in the solicitation of [an]

11  immediate sale." *Id.*

12       The Woodford Defendants would like the Court to similarly analogize their Webinar with

13  a road show presentation because it does not involve direct communication targeting Ferrie

14  specifically. But not all courts apply such a strict standard to Section 12 claims. *In re Charles

15  Schwab Corporation Securities Litigation*, for example, observed that "the Ninth Circuit has not

16  explained precisely what [a defendant's] direct role [in solicitation must] entail." 257 F.R.D. 534,

17  549 (N.D. Cal. 2009) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005)). The

18  court went on to hold that the defendants' signing of a registration statement and marketing of

19  the fund demonstrated "more than mere participation" and were sufficient to survive dismissal.

20  *Id.*; *see also Pirani v. Slack Techs., Inc.*, No. 19-CV-05857-SI, 2020 WL 1929241, at *11 (N.D.

21  Cal. Apr. 21, 2020) (declining to dismiss where "Plaintiff alleges that all of the Individual

22  Defendants signed the Offering Materials, that certain defendants solicited sales at the Investor

23  Day, and that all of the Individual Defendants were financially motivated to solicit sales");

24

*Harelson v. Miller Fin. Corp.*, 854 F.2d 1141, 1142 (9th Cir. 1988) ("Wilson did not personally seek out the customers, but, like a car salesman, waited for them to come to his place of business. He presented the basic facts necessary to effectuate a sale. . . . He solicited the sale. He was a seller.").

The Woodford Defendants' alleged actions likewise go beyond mere participation and satisfy *Pinter*'s test for solicitation at the pleading stage. The Webinar included statements that not only promoted the benefits of ARBs but actively encouraged viewers to invest. *See* FAC at 7 ("I recommend [that an investor] put whatever risk amount of money you're going to start with, whether its $250 or if it's a million dollars. . . . Let's just get the money in here and get you making some money."). This was "more than mere participation" in the sale of securities. *Charles Schwab*, 257 F.R.D. at 549.  Further, although the Woodford Defendants did not sell the ARBs themselves, their 1% Club program was essentially the gateway that enabled Ferrie to invest. Ferrie had to pay for his 1% Club subscription and he also alleges that the Woodford Defendants received a fee from Arbitraging for recruiting investors. FAC at 15. The Woodford Defendants therefore had a financial interest in getting Ferrie to invest in ARBs.

The Court is unpersuaded by the Woodford Defendants' arguments that a plaintiff cannot state a Section 12 claim without alleging interaction with and targeting by the solicitor. The Woodford Defendants claim that Ferrie must allege a "back and forth" exchange in order to show active solicitation, but they cite no cases imposing that requirement. They also argue that the Webinar had to target Ferrie in particular, citing *Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV, 2019 WL 2085839, at *3-4 (S.D. Fla. May 13, 2019). In *Rensel*, the court held that allegations of general advertising of a crypto-currency token via Twitter were insufficient to state a claim under Section 12. *Id.* at *4. But the Woodford Defendants ignore that *Rensel*'s holding

1   was based on the plaintiffs' failure to allege they ever *saw* the promotional tweets or were

2   motivated by them. *Id.* In contrast, Ferrie alleges that he purchased his 1% Club subscription and

3   began investing after viewing the Webinar. FAC at 9. Indeed, it is hard to imagine how he would

4   have known about Arbitraging otherwise.

5         Finally, the Woodford Defendants argue that Ferrie's Section 12 claim sounds in fraud

6   but fails to comply with Rule 9(b)'s heightened pleading requirements. However, as several

7   courts have observed, "failure to register securities [under Section 12(1)] need not be pled with

8   the specificity required by Rule 9(b)." *Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402,

9   1406 n.4 (N.D. Cal. 1992); *see also In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates*

10  *Sec. Litig.*, 636 F. Supp. 1138, 1172 (C.D. Cal. 1986) (holding that Section 12(1) "is not

11  grounded in fraud"); *see also Hokama v. E.F. Hutton & Co.*, 566 F. Supp. 636, 646 (C.D. Cal.

12  1983) (omitting Section 12(1) claim from heightened pleading requirements).

13        The Woodford Defendants cite cases applying Rule 9(b) to claims under Section 12(2).

14  *See In re CytRx Corp. Sec. Litig.*, No. CV141956GHKPJWX, 2015 WL 5031232, at *13 (C.D.

15  Cal. July 13, 2015); *In re Infonet*, 310 F. Supp. 2d at 1093-94, 1100. But liability under Section

16  12(2) turns on the defendant's knowing or negligent misrepresentations. Section 12(1), by

17  contrast, "impos[es] strict liability upon persons who offer or sell unregistered securities" and

18  therefore does not rely on Ferrie's allegations of misrepresentation and concealment. *McDaniel*

19  *v. Compania Minera Mar de Cortes, Sociedad Anonimo, Inc.*, 528 F. Supp. 152, 159 (D. Ariz.

20  1981). Ferrie's Section 12 claims against Woodford Research, Senters, and Arvin for publishing

21  the Webinar need not satisfy Rule 9(b). Nonetheless, the FAC is impermissibly broad and

22  attributes actions to all Defendants indiscriminately. FAC at 19. As with his other claims, Ferrie

23  must amend his Section 12 claim to remedy this problem.

24

ORDER ON WOODFORD DEFENDANTS'
MOTION TO DISMISS - 20

1

### c.     *Fraud-Based Claims*

2      Ferrie asserts the following fraud-based claims against the Woodford Defendants: Violation

3 of Section 10(b) of the Exchange Act and SEC Rule 10b5(b), Fraudulent Misrepresentation,

4 Fraudulent Concealment, and Negligent Misrepresentation. FAC at 19-26. The elements of a

5 securities fraud claim under Rule 10b-5 are: "(1) a material misrepresentation or omission by the

6 defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase

7 or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)

8 loss causation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016); *Atari Corp. v. Ernst*

9 *& Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992).

10      Similarly, a Washington fraudulent misrepresentation claim requires: "(1) a representation of

11 existing fact, (2) that is material, (3) and false, (4) the speaker knows of its falsity, (5) intent to

12 induce another to act, (6) ignorance of its falsity by the listener, (7) the latter's reliance on the truth of

13 the representation, (8) her right to rely on it, and (9) consequent damage." *See Baker Boyer Nat'l*

14 *Bank v. Foust*, 436 P.3d 382, 386 n.4 (Wash. Ct. App. 2018). A defendant is liable for negligent

15 misrepresentation if (1) it supplied false information, (2) that it knew or should have known would be

16 used as guidance in the plaintiff's business transactions, (3) was negligent in obtaining or

17 communicating the false information, (4) the plaintiff reasonably relied on the false information, and

18 (5) the false information proximately caused damages. *Ross v. Kirner*, 172 P.3d 701, 704 (Wash.

19 2009).

20      "To establish fraudulent concealment, the plaintiff may either 'affirmatively plead and prove

21 the nine elements of fraud or simply show that the defendant breached an affirmative duty to disclose

22 a material fact.'" *Schreiner Farms, Inc. v. Am. Tower, Inc.*, 293 P.3d 407, 412 (Wash. Ct. App. 2013)

23 (quoting *Crisman v. Crisman*, 85 Wash.App. 15, 21 (1997)). "Where the law imposes a duty on one

24 party to disclose all material facts known to him and not known to the other, silence or concealment

1    in violation of this duty with intent to deceive will amount to fraud as being a deliberate suppression

2    of the truth and equivalent to the assertion of a falsehood." *Stiley v. Block*, 130 Wash. 2d 486, 515-16

3    (1996) (Talmadge, J., concurring) (quoting *Oates v. Taylor*, 31 Wash. 2d 898, 902-03 (1948)).

4           Fed. R. Civ. P. 9(b) imposes a heightened pleading standard for claims "grounded in

5    fraud," a category that includes any claim relying upon a "unified course of fraudulent conduct"

6    *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003), or in which fraud is an

7    "essential element." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1265 (W.D.

8    Wash. 2009). For such claims, "the complaint must 'set forth what is false or misleading about a

9    statement, and why it is false.'" *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir.

10   2009). This means the plaintiff is required to "state the time, place, and specific content of the

11   false representations as well as the identities of the parties to the misrepresentation." *Sanford v.*

12   *MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).

13          Ferrie's claims of misrepresentation and concealment have fraud as an essential element

14   and therefore must satisfy Rule 9(b), as Ferrie himself concedes. In his fraudulent and negligent

15   misrepresentation claims, Ferrie describes the following misleading statements:

16          Defendants made false misrepresentations of material facts regarding their
             products, goods and services, including their involvement in the production,
17           development, and  functionality of Defendant ARBITRAGING's "highly
             advanced" arbitraging bot, the legitimacy of Defendant ARBITRAGING's
18           services, including the existence of a functioning "highly advanced" arbitraging
             bot, the ability to generate steady returns from arbitraging cryptocurrencies
19           among different exchanges, and the legitimacy of profits derived from arbitraging
             cryptocurrencies as opposed to generating commissions based on new
20           investments, among other fraudulent misrepresentations.

21   FAC at 29.

22          Ferrie's fraudulent concealment claim resembles his misrepresentation claim and alleges

23   the following:

24

Defendants intentionally concealed material information that was otherwise unknown to Plaintiff and intended to deceive Plaintiff by concealing such information, including but not limited to: Defendants receipt of a portion of Plaintiff's investment via commissions, referral fees, and other charges of a portion of his investment; Defendants were not making daily returns of approximately 0.73 percent exclusively based on arbitrage trading; Defendants would charge numerous undisclosed and oppressive fees after receipt of Plaintiff's investment; and Defendants did not have a "highly advanced" arbitraging bot, among other concealments.

FAC at 25. For his Section 10(b) claim, Ferrie merely asserts that Defendants' "promotional materials, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ARBITRAGING's business and ARBs' value." *Id.* at 20. All four claims incorporate Ferrie's more detailed factual allegations from earlier in the FAC.

First, Ferrie's Section 10(b) claim against the Woodford Defendants is entirely conclusory. His basis for the claim does not clearly correspond to any of his more specific allegations about statements in the Webinar. Ferrie also makes no effort to defend this claim in his Opposition. The Section 10(b) claim against the Woodford Defendants accordingly fails.

As for Ferrie's state law misrepresentation claims, the Court agrees with the Woodford Defendants that statements in the Webinar about Arbitraging's "legitimacy" or "trustworthiness" are vague opinions that cannot support a fraud claim. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, . . . [are] non-actionable puffing." (internal quotation omitted)). Senters also qualified these statements by describing Arbitraging as "sketchy" and warning viewers about over-exposure. FAC at 8.

Other statements that Ferrie identifies as fraudulent are not revealed as false in the FAC or were never made. Ferrie alleges no specific problems with Arbitraging's bot or the bot's non-

1  existence, nor did the Woodford Defendants claim to be have been involved in producing or

2  developing the bot. Ferrie also does not allege that his returns were not "steady;" indeed, Ferrie

3  was pleased enough with his returns that he put all his savings into his Arbitraging account. In

4  addition, statements in the Webinar about future returns were projections that need not be

5  completely precise. *See Zowine v. Prussin*, No. CV-14-00892-PHX-GMS, 2016 WL 558550, at

6  *8 (D. Ariz. Feb. 12, 2016) ("A reasonable person knows that investments involve risk, and a

7  'promise' that an investment will reap high returns cannot amount to more than a prediction.");

8  *Marx v. Comp. Scis. Corp.*, 507 F.2d 485, 489 (9th Cir. 1974) ("a reasoned and justified

9  statement of opinion," with "a sound factual or historical basis, is not actionable" absent a "gross

10  disparity" between the prediction and an actual, undisclosed reality).

11       This leaves the representation about "the legitimacy of profits derived from arbitraging

12  cryptocurrencies as opposed to generating commissions based on new investments." This may

13  refer to Senters's statements in the Webinar that he was "making $600, $700 a day" and had

14  "$100,000 working in this robot" when Senters was also making money off referral and

15  commission fees. FAC at 8. However, the fact that hypothesizing is necessary to understand

16  Ferrie's claim means it does not comply with Rule 9(b). Ferrie's claim must identify the

17  misrepresentation and explain why it was false. And, even if the Court's hypothesis is correct,

18  the FAC does not explain why Senters's failure to mention his profits from fees would mean his

19  profits from Arbitraging were non-existent. Because Ferrie does not clearly identify any explicit

20  misrepresentations in the Webinar, his fraudulent and negligent misrepresentation claims are

21  dismissed.

22       Ferrie's fraudulent concealment claim fairs better. Here, Ferrie at least identifies

23  information—Senters's use of Arbitraging's "internal exchange," receipt of a commission and

24

2% rereferral fees, and Arbitraging's other impending "oppressive fees"— that was omitted from the Webinar. These omissions were also material. A "material fact" is one "to which a reasonable [person] would attach importance in determining his or her choice of action in the transaction in question." *Guarino v. Interactive Objects, Inc.*, 122 Wash. App. 95, 114 (2004) (quoting *Aspelund v. Olerich*, 56 Wash.App. 477, 481-82 (1990)). "For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id*. (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

The Woodford Defendants attempt to single out each misrepresentation and explain why, for example, failing to mention the 2% referral fee could not have been material because Ferrie continued to invest even after learning of it. But the FAC alleges a collection of omissions that, together, induced Ferrie to act. Viewed in this light, it is plausible that knowing these facts would have "significantly altered the 'total mix' of information." *Guarino*, 122 Wash. App. at 114.

However, Ferrie's fraudulent concealment claim against the Woodford Defendants still fails to satisfy Rule 9(b). Like his other claims, Ferrie fails to differentiate the Defendants or explain with specificity what each concealed and when. For example, the FAC confusingly refers to both a "2-percent referral commission" that Ferrie paid to Woodford Research (or perhaps just Senters) and a "commission from Arbitraging" that Senters received. FAC at 12, 15. The relationship between these payments and how/when Ferrie learned of each is unclear.

Ferrie also fails to articulate the concrete basis of each Defendant's duty and when it arose. "A duty to disclose material facts exists for a person who, in the course of business, supplies information for the guidance of others in their business transactions." *Giraud v. Quincy Farm & Chem.*, 102 Wash. App. 443, 453 (2000). Ferrie alleges that "Defendants had a duty to

1   disclose to Plaintiff material information when they made partial or outright false disclosures that

2   conveyed a false impression regarding the nature of Defendant ARBITRAGING's products,

3   goods, and services, including the absence of them featured 'highly advanced' arbitraging bot"

4   and "Defendants had a duty to disclose to Plaintiff material information when they solicited and

5   accepted Plaintiff's investment." FAC at 25. These statements are vague, conclusory, and based

6   partially on allegations that the Court has identified as unsupported by the rest of the FAC.

7   Ferrie's fraudulent concealment claim therefore fails to satisfy Rule 9(b).[6]

8   **d.    *Unjust Enrichment***

9           "Unjust enrichment is the method of recovery for the value of the benefit retained absent

10   any contractual relationship because notions of fairness and justice require it." *Young v. Young*,

11   164 Wash. 2d 477, 484 (2008). "Three elements must be established in order to sustain a claim

12   based on unjust enrichment: a benefit conferred upon the defendant by the plaintiff; an

13   appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the

14   defendant of the benefit under such circumstances as to make it inequitable for the defendant to

15   retain the benefit without the payment of its value." *Id.* (quoting *Bailie Commc'ns, Ltd. v. Trend*

16   *Bus. Sys., Inc.*, 61 Wash. App. 151, 159 (Wash. Ct. App. 1991)).

17           The Woodford Defendants argue that Ferrie's unjust enrichment claim must satisfy

18   Rule 9(b) because it relies on the same allegations that support his fraud claims. They further

19   contend that Ferrie's allegations do not meet this standard because they do not explain which

20   Defendant received which funds or why circumstances indicate unjustness.

21

22

23   [6] The Woodford Defendants make additional arguments about scienter, reliance, causation, and
     damages. These issues are not necessary to resolve the current Motion and will be easier to
24   address if Ferrie amends his allegations.

1   The Court agrees that Ferrie's unjust enrichment claim depends on his allegations of

2   intentional concealment of information to establish unjust circumstances; Rule 9(b) therefore

3   applies. The unjust enrichment claim fails to meet this standard for many of the same reasons as

4   the fraud-based claims. Ferrie fails to differentiate between Defendants or identify exactly what

5   sums were unjustly obtained. For example, Ferrie mentions "commissions, referral fees, and

6   other charges," but elsewhere in the FAC he describes a referral fee paid by *Arbitraging* to the

7   Woodford Defendants or Senters alone. FAC at 18, 26. This fee was not even paid by Ferrie.

8   These shortcomings defeat Ferrie's unjust enrichment claim as currently pled.

9   **CONCLUSION**

10   For these reasons, the Court GRANTS the Woodford Defendants' Motion in part and

11   DENIES it in part. Ferrie shall have 30 days from the date of this Order to file an amended

12   complaint that addresses the problems with his claims against the Woodford Defendants. Failure

13   to meet this deadline shall result in Ferrie's claims being dismissed without further notice.

14   The parties are also ORDERED to engage in limited discovery regarding personal

15   jurisdiction. The discovery should focus on the Woodford Defendants' contacts with Washington

16   State, including their viewer and customer base, and whether their contacts with Ferrie are

17   sufficiently intertwined with the forum to justify exercising jurisdiction. Jurisdictional discovery

18   //

19   //

20   //

21   //

22   //

23   //

24

should be completed within 60 days of this Order. The Woodford Defendants may renew their motion to dismiss for lack of personal jurisdiction at the conclusion of discovery if they wish.

IT IS SO ORDERED

Dated this 14th day of July, 2020.

Ronald B. Leighton
United States District Judge